UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,           )
         Plaintiff,                 )
                                    )
    v.                              ) Civil Action No.
                                    )
$10,550.00 IN U.S. CURRENCY,        )  04cv12185 RGS
         Defendant.                 )

### VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, in a civil action of forfeiture pursuant to Title 31, United States Code, Section 5332(c), and Title 21, United States Code, Sections 881(a)(6) and (b), alleges that:

1. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345, 1355, and 1356. Venue is appropriate pursuant to 28 U.S.C. § 1395.

2. The in rem defendant currency is now, and, during the pendency of this action, will be within the jurisdiction of this Court.

3. The defendant currency is identified as $10,550.00 in United States currency, seized from Sonia Amarilis Romero Romero, a/k/a Arquidia Maria Castillo, on April 28, 2004, at Logan International Airport, Boston, Massachusetts (the "Defendant Currency").

4. As detailed in the Affidavit of United States Drug Enforcement Administration Special Agent Robert Donovan, attached

hereto as Exhibit A, and incorporated herein by reference, the United States has probable cause to believe that the Defendant Currency represents property involved in a bulk cash smuggling violation, or in a conspiracy to commit such a violation, in that it represents more than $10,000 in currency or other monetary instrument knowingly concealed on the person or in any conveyance, article of luggage, merchandise, or other container, with the intent to evade a currency reporting requirement under 31 U.S.C. §5316, and transported or transferred or attempted to be transported or transferred from a place within the United States to a place outside the United States, or from a place outside the United States to a place within the United States.

5.   In addition, I have probable cause to believe that the Defendant Currency constitutes proceeds of illegal narcotics distribution, and/or was used or intended to be used to commit, or to facilitate the commission of, a violation of 21 U.S.C. 841 and/or 846.

6.   The Defendant Currency, therefore, is subject to seizure and forfeiture to the United States of America, pursuant to 31 U.S.C. §5332(c), and 21 U.S.C. §§881(a)(6) and (b).

WHEREFORE, the United States of America prays:

1.   That a warrant and monition, in the form submitted herewith, be issued to the United States Marshal for the District of Massachusetts, commanding him to serve process upon the

Defendant Currency, and to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

2. That judgment of forfeiture be decreed against the Defendant Currency;

3. That thereafter, the Defendant Currency shall be disposed of according to law; and

4. For costs and all other relief to which the United States may be entitled.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By: _____
JENNIFER H. ZACKS
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated: October 19, 2004

## VERIFICATION

I, Robert Donovan, Special Agent, United States Drug Enforcement Administration, state that I have read the foregoing Verified Complaint for Forfeiture <u>In Rem</u> and the Affidavit, attached as Exhibit A, and that the contents thereof are true to the best of my knowledge, information and belief.

*/s/ Robert Donovan*
Robert Donovan, Special Agent,
United States Drug Enforcement
Administration

Dated: 10-18-04


COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                                          Boston

   Then personally appeared before me the above-named Robert Donovan, Special Agent, United States Drug Enforcement Administration, who acknowledged the foregoing to be true to the best of his knowledge, information, and belief, on behalf of the United States of America.

   Subscribed to and sworn to before me this 18th day of October, 2004.

*/s/ Lisa J. Talbot*
Notary Public
My commission expires: 5/29/09

> LISA J. TALBOT
> Notary Public
> Commonwealth of Massachusetts
> My Commission Expires
> May 29, 2009

N:\LTalbot\Zacks\$10,550 in U.S. Currency\Complaint for Forfeiture.wpd

**EXHIBIT A**

**AFFIDAVIT OF SPECIAL AGENT ROBERT DONOVAN**

I, Robert Donovan, being duly sworn, depose and state:

1. I am a Special Agent of the United States Drug Enforcement Administration ("DEA"), and have served in this capacity for over seven (7) years.

2. I am currently assigned to the Boston, Massachusetts, Division Office. During my tenure as a Special Agent, I have worked on hundreds of drug investigations. I have written and/or participated in the execution of numerous search warrants resulting in the seizures of large quantities of controlled substances; packing implements and other paraphernalia involved in the manufacture and distribution of controlled substances; large amounts of United States currency, ledger books, bank records, telephone books, receipts, drug customer lists, and other documents relating to the manufacturing, transportation, ordering, purchasing, and distribution of controlled substances.

3. The information contained in this Affidavit was either observed by me or related to me by other law enforcement officers involved in this investigation. I submit this Affidavit in support of a Complaint for Forfeiture in Rem against $10,550.00 in United States currency, seized from Sonia Amarilis Romero Romero, a/k/a Arquidia Maria Castillo, on April 28, 2004, at Logan International Airport, Boston, Massachusetts (the "Defendant Currency").

1

4. As set forth below, I have probable cause to believe that the Defendant Currency is subject to seizure and forfeiture to the United States pursuant to Title 31, United States Code, Section 5332(c), as property involved in a bulk cash smuggling violation, or in a conspiracy to commit such a violation, in that it represents more than $10,000 in currency or other monetary instrument knowingly concealed on the person or in any conveyance, article of luggage, merchandise, or other container, with the intent to evade a currency reporting requirement under 31 U.S.C. §5316, and transported or transferred or attempted to be transported or transferred from a place within the United States to a place outside the United States, or from a place outside the United States to a place within the United States.

5. In addition, I have probable cause to believe that the Defendant Currency is subject to seizure and forfeiture to the United States pursuant to Title 21, United States Code, Sections 881(a)(6) and (b), because it constitutes proceeds of illegal narcotics distribution, and/or was used or intended to be used to commit, or to facilitate the commission of, a violation of 21 U.S.C. 841 and/or 846.

**THE INVESTIGATION**

6. On or about April 28, 2004, Logan Airport Task Force Officer Victor Diaz ("TFO Diaz") and I were called to the American Eagle Security Checkpoint at Terminal B at Logan International

2

Airport in Boston, Massachusetts, by Transportation Safety Administration ("TSA") personnel who reported a woman traveling with a large sum of money. TSA informed me and TFO Diaz that during a routine screening of passengers, personnel discovered that a woman attempting to board American Airlines Flight No. 2087, Boston to Santa Domingo, Dominican Republic, was in possession of a large amount of U.S. currency. Approximately $10,550.00 of this currency was contained in multiple envelopes, which in turn, were placed inside a pink diaper bag with children's clothing that the individual, who had been stopped by TSA, was carrying onto her flight. The woman claimed that her name was Arquidia Maria Castillo, and during her interview provided documentation with that name. However, as discussed in more detail below, she later admitted that "Castillo" was a false name, that she was traveling with fraudulent identification, and that her true name was Sonia Amarilis Romero Romero. To avoid confusion, this affidavit will refer to her as "Romero."

7.   I observed Romero sitting with a small child on her lap at the TSA security checkpoint. During the interview, we discovered a birth certificate for the child, stating that the child's date-of-birth was March 3, 2003. TFO Diaz conducted a conversation with Romero in Spanish, as Romero claimed not to speak English. TFO Diaz identified himself and me as law enforcement officers. He told Romero that she was not under arrest, but that

3

we had some questions about the currency in her carry-on luggage. TFO Diaz then asked Romero if she would voluntarily agree to speak with us about the U.S. currency and also whether she would consent to a search of her luggage. Romero told TFO Diaz that she understood and voluntarily agreed to answer questions and to a search of her luggage.

8. Pursuant to Romero's consent, I searched her carry-on luggage, which consisted of a blue and red zipper bag, a pink diaper bag with zippers, and a black bag that Romero stated was her purse. I also observed, on the TSA screening table, several white business size envelopes and a yellow manila type envelope. TSA personnel indicated that all but one of the white envelopes were found inside the yellow manila envelope, which was contained in the pink diaper bag that Romero had as part of her carry-on luggage. TSA personnel indicated the remaining white envelope had been found in Romero's purse. The envelope found in Romero's purse contained $347.00 in United States currency, along with travel tickets and documents. Romero's travel tickets were in the name of Orquidia Castillo. Romero was also carrying a birth certificate under the name of Orquidia Maria Romero Romero and a letter from the Consulate General of the Dominican Republic under the name of Arquidia Maria Castillo. As discussed below, the $347.00 found in Romero's purse was subsequently returned to her, and is not part of the Defendant Currency that is the subject of this civil forfeiture

4

action.

9. I looked through the eight white business-size envelopes found in Romero's carry-on luggage, and found that seven of these envelopes contained U.S. currency, totaling $10,550.00. In addition, several of the envelopes had what appeared to be handwritten names on the outside. The currency amounts in each envelope and the inscriptions were as follows:

- a. $3000 (consisting of thirty $100 bills)
  "Para Lucia De Esmaraldo"

- b. $1,000 (consisting of eight $100 bills and ten $20 bills)
  "Para Nino"

- c. $3,000 (consisting of thirty $100 bills)
  "Para Luiz"

- d. $3000 (consisting of thirty $100 bills)
  "Para Mireya 7"

- e. $250 (consisting of twelve $20 bills and one $10 bill)
  This envelope had no inscription

- f. $200 (consisting of ten $20 bills)
  "Para Yuliza"

- g. $100 (consisting of five $20 bills)
  This envelope had no inscription.

10. The eighth white business size envelope found in Romero's carry-on luggage contained a receipt from the Boston, Massachusetts, Consulate Office of the Dominican Republic for the sum of $100.00. The receipt indicated that the $100.00 was for acquiring documentation in the name of "Arquidia Maria Castillo."

11. Also discovered inside Romero's carry-on luggage were official looking documents from the Dominican Republic in various

5

names, both male and female.

12. Romero stated that she had been in the United States since July 2, 2003, and that she had been staying with her daughter, Moreta Altagracia ("Altagracia"), in Dorchester, Massachusetts. Romero stated that she intended to travel to the Dominican Republic and to remain there. However, included with Romero's travel documents was a ticket for a return flight to Boston on May 15, 2004, in the name of the young child who was traveling with Romero. Romero stated that she did not plan to return to the United States with the child. Furthermore, Romero stated that she did not know who would be bringing the child back to Boston.

13. Romero claimed that the child traveling with her was the child of one of Romero's friends, who had asked Romero to take the child to visit the child's grandfather in the Dominican Republic. Romero told TFO Diaz the child's name. However, Romero could not remember the name of the child's mother's and was unable to provide a telephone number at which the child's mother could be contacted.

14. Although Romero had identified herself as "Arquidia Maria Castillo," and was carrying documentation from the Dominican Republic Consulate in that name, she was found to be carrying prescription medication in the name of Sonia Romero. When confronted with this medication, she admitted that her true name was Sonia Amarilis Romero Romero and that the document from the

Dominican Republic Consulate was fraudulent. Romero then claimed that her passport had been stolen and that, for the purpose of traveling, Romero had used her cousin's identifying information to acquire documentation from the Dominican Republic Consulate under a false name.

15. Romero then stated that the small child traveling with her was actually Romero's granddaughter. However, Romero asserted that she did not know the child's date of birth. Romero stated that the child's mother was Romero's daughter, "Altagracia." Romero also stated that Altagracia was Romero's only child. According to Romero, Altagracia, had asked Romero to bring the child to the Dominican Republic. However, Romero was unable to explain the purpose of this trip.

16. During the course of this discussion, I noticed that Romero appeared nervous, looking around and having difficulty sitting still. Romero repeatedly got up and walked over to where I was searching her luggage, leaving the small child unsupported in a chair. In addition, TFO Diaz noticed that Romero was constantly changing her story and was unable to maintain eye contact while talking with him.

17. When asked about the Defendant Currency, Romero first asserted that she had been given her envelopes containing money and had been told to take them to the Dominican Republic by someone she did not know. Romero next stated that she had received the

envelopes from a male acquaintance. However, Romero could not remember the name of this acquaintance or describe what he looked like. Romero was also unable to identify the location where this male acquaintance had given her the envelopes containing the Defendant Currency. Romero next stated that she planned to bring the Defendant Currency to family members in the Dominican Republic. However, Romero could not identify any of the persons that were to receive the Defendant Currency. Although, as described above, several of the envelopes had names written on them, at no time during the interview did Romero mention any of these names or refer in any way to the fact that names were written on the envelopes.

18. Although, as noted above, Romero had initially claimed that her passport had been stolen, she then changed her story, telling TFO Diaz that her passport had been seized by the Boston Police Department during a raid at her daughter's home. Romero then changed her story again, admitting that her passport had neither been stolen nor seized by the police. Instead, Romero now claimed she had given her passport to her daughter, Altagracia, for safekeeping. Romero said that she traveled frequently between the Dominican Republic and Boston and feared that her visa would be revoked, because she had remained in the United States for longer than the permitted time limit. In order to avoid the revocation of her visa, Romero said that she had acquired the fraudulent identification in the name of Castillo for the purpose of

8

traveling.

19. Romero then agree to accompany TFO Diaz and me to the Troop F Massachusetts State Police Barracks (the "Barracks"), so that it could be determined who should have custody of the child. Outside the security checkpoint, Group Supervisor Michael McCormick, TFO Diaz, and I approached an Hispanic male, who had dropped Romero off at the airport. He identified himself as Felix Tomas Mejias-Claudio of Roslindale, Massachusetts ("Mejias-Claudio"). Mejias-Claudio told TFO Diaz, in English, that he was a friend of Romero's daughter and that he wanted to know what was going on. Mejias-Claudio then told TFO Diaz, in Spanish, that he did not speak English. Then, speaking in Spanish to TFO Diaz, Mejia-Claudio stated that he was a friend of Romero's daughter and that he had driven Romero to the airport as a favor to the daughter. Mejia-Claudio also confirmed that the child was Romero's daughter's child. Mejia-Claudio agreed to get the child's mother and bring her back to the Barracks. A criminal records check of Mejia-Claudio revealed that he had been arrested in Pennsylvania in 2003 for conspiracy and possession with intent to distribute heroin and crack cocaine, and that, at the time of his arrest, two handguns had been seized from Mejia-Claudio.

20. While Romero and the child were en route to the Barracks, I retrieved her checked luggage in the TSA security baggage area. Since Romero had previously consented to a search of her luggage,

9

and since two of the three suitcases did not have a lock on them, I searched two of them inside the TSA security baggage area in the presence of TSA personnel. In one of the suitcases, I found two more official-looking documents bearing Dominican Republic seals. The documents were contained in a white business-size envelope, similar to the envelopes containing the Defendant Currency. No other money or contraband was found in the suitcases. I then transported the three suitcases to the Barracks, where Romero voluntarily provided the combination to the third suitcase, in which no money or contraband was found.

21. At the Barracks, TFO Diaz again asked Romero who was supposed to receive the Defendant Currency in the Dominican Republic. Romero told TFO Diaz that three or four thousand dollars was being sent by "Luis Romero" to "Manuel Romero." Romero also stated that an unknown amount of money was being sent by "Juan Castillo" to "Enedina Castillo" and that another unknown amount was being sent by "Enrique Romero" to "Altagracia Romero." Romero confirmed that the $347.00 found in her purse belonged to her. At this time, I returned the $347.00 to Romero and provided her with a receipt documenting its return. Because the remaining currency was being seized, I provided Romero with a receipt indicating the seizure of the Defendant Currency, and TFO Diaz explained to Romero that the DEA was seizing the Defendant Currency as suspected narcotics proceeds.

22. A short time later, Mejia-Claudio returned with an Hispanic female who identified herself as Altagracia, the daughter of Romero. When she arrived, Altagracia was carrying a one-month old infant in an infant carrier. Altagracia voluntarily agreed to answer questions and TFO Diaz spoke to her in Spanish. Altagracia stated that her mother did not know anything about the Defendant Currency, other than that she was to bring it to the Dominican Republic. Altagracia then stated that ". . . we are aware that we can bring up to $10,000.00 to the Dominican Republic without declaring it . . ." When asked who she meant by "we", Altagracia stated that she was referring to her family.

23. Altagracia then stated that ". . . some person gave her mother the money" and said that this person "is a relative of her sister's husband in the Dominican Republic." However, as noted above, Romero had previously stated that Altagracia was Romero's only child. When asked to clarify, Altagracia then stated that "the person" that handed the money to her mother was her sister's brother-in-law, and that the brother-in-law had given Romero the money to bring to his family in the Dominican Republic. Altagracia could not supply a name or a description for either the brother-in-law or the sister.

24. Altagracia stated that she had asked Romero to bring the child to take to the Dominican Republic to visit a grandfather. However, Altagracia said that she had no plans to travel to the

11

Dominican Republic to retrieve the child. Despite the fact that a return trip ticket for the child for May 15, 2004, had been found in Romero's luggage, Altagracia said nothing about any arrangements for the child's return.

25. Because there was not enough room in Mejia-Claudio's car, TFO Diaz assisted Romero and Altagracia in obtaining a taxicab. While walking to the taxi area, Altagracia told TFO Diaz that $1,000.00 of the seized Defendant Currency belonged to her and that she would be making a claim for the return of her money. Altagracia went on to say ". . . to hell with him and his money, he can claim his money if he wants, but I'm claiming mine." While Altagracia did not specifically identify the person she was referring to as "he," TFO Diaz understood that Altagracia was referring to Mejia-Claudio.

26. I then notified Task Force Officer Mark West ("TFO West"), and arranged for TFO West and his narcotic detecting K-9 "Tracer" to check the Defendant Currency. Tracer is certified in the detection of heroin, cocaine, methamphetamine, and marijuana. The Defendant Currency, which was still divided in the white business size envelopes, was all placed back in the yellow manila envelope that was found in Romero's carry-on luggage. The yellow manila envelope was then placed amongst other similar envelopes, containing shredded clean currency. TFO West then introduced Tracer to the various envelopes. Tracer responded positively to

the yellow manila envelope containing the Defendant Currency, by sitting, indicating the presence of the odor of narcotics.

27. In the administrative forfeiture proceeding, on or about July 26, 2004, the United States received a verified claim from an individual by the name of Raquel Arias ("Arias"), in which she stated under the penalty of perjury that she was the owner of the entire amount of the Defendant Currency, that is, $10,550.00. The United States then requested additional information from Arias to verify the validity of her claim to the Defendant Currency. Subsequently, on or about August 27, 2004, Arias, through counsel, sent a letter to the United States in which she disavowed her previous statement under oath, now stating that she claimed only a portion of the Defendant Currency, which Arias claimed to have loaned to an individual by the name of "Maria Castillo". The letter from Arias' counsel stated that "Ms. Arias does not have a colorable interest in any amount of money seized from Maria Castillo in excess of...$7,100."

28. Based upon the foregoing, there is probable cause to believe that Defendant Currency is subject to seizure and forfeiture to the United States pursuant to Title 31, United States Code, Section 5332(c), as property involved in a bulk cash smuggling violation, or in a conspiracy to commit such a violation, in that it represents more than $10,000 in currency or other monetary instrument knowingly concealed on the person or in any

13

conveyance, article of luggage, merchandise, or other container, with the intent to evade a currency reporting requirement under 31 U.S.C. §5316, and transported or transferred or attempted to be transported or transferred from a place within the United States to a place outside the United States, or from a place outside the United States to a place within the United States.

29. In addition, there is probable cause to believe that the Defendant Currency is subject to seizure and forfeiture to the United States pursuant to Title 21, United States Code, Sections 881(a)(6) and (b), because it constitutes proceeds of illegal narcotics distribution, and/or was used or intended to be used to commit, or to facilitate the commission of, a violation of 21 U.S.C. 841 and/or 846.

Signed under the pains and penalties of perjury this 18 day of October, 2004.

ROBERT DONOVAN
Special Agent
U.S. Drug Enforcement Administration